# Supreme Court of Florida

_____

No. SC14-2350

_____

## IN RE:  CERTIFICATION OF NEED
## FOR ADDITIONAL JUDGES.

[December 22, 2014]

PER CURIAM.

This opinion fulfills our constitutional obligation to determine the State's

need for additional judges in Fiscal Year 2015/2016 and to certify our "findings

and recommendations concerning such need" to the Legislature.[1]  Certification is

"the sole mechanism established by our constitution for a systematic and uniform

---

1. Article V, section 9, of the Florida Constitution provides in pertinent part:

> **Determination of number of judges.**—The supreme court
> shall establish by rule uniform criteria for the determination of the
> need for additional judges except supreme court justices, the necessity
> for decreasing the number of judges and for increasing, decreasing or
> redefining appellate districts and judicial circuits.  If the supreme
> court finds that a need exists for increasing or decreasing the number
> of judges or increasing, decreasing or redefining appellate districts
> and judicial circuits, it shall, prior to the next regular session of the
> legislature, certify to the legislature its findings and recommendations
> concerning such need.

assessment of this need." <u>In re Certification of Need for Additional Judges</u>, 889 So. 2d 734, 735 (Fla. 2004).  In this opinion we are certifying a need for thirty-five trial court judges and none in the district courts of appeal as further elaborated below.

## TRIAL COURTS

The Florida Supreme Court continues to use a weighted caseload system as a primary basis for assessing judicial need for the trial courts.[2]  Using objective standards, this Court has examined case filing and disposition data, analyzed various judicial workload indicators, applied a three-year average net need, and considered judgeship requests submitted by the lower courts.  Applying this methodology, this Court certifies the need for thirty-five judgeships statewide, three of which are in circuit court and thirty-two in county court as detailed in the attached appendix.

As the state economy continues to steadily improve, we recognize that in a post-recessionary period competing demands for state funding persist across state government.  We also note that, due in large part to the recession, the judicial branch has had no increase in trial court judges since 2007, despite a documented need.  Nonetheless, our judges and court staff continue to work diligently to

2. Our certification methodology relies primarily on case weights and calculations of available judge time to determine the need for additional trial court judges.  <u>See</u> Fla. R. Jud. Admin. 2.240.

administer justice, promptly resolve disputes, and ensure that children, families, and businesses receive the proper amount of judicial attention to their cases.

Our most recent analysis of circuit court statistics from Fiscal Year 2012/2013 to preliminary Fiscal Year 2013/2014 indicates a six percent increase in probate filings, a nine percent increase in dependency filings, and a circuit civil filing (excluding real property/mortgage foreclosures) increase of one percent. Conversely, domestic relations filings declined by three percent, while felony and juvenile delinquency filings experienced a seven percent decline. Similar downward filing trends are occurring nationally, and we continue to closely monitor and analyze filing trends throughout the state as filings and case type filing trends relate to judicial case weights and influence workload analysis. We also continue to control for the foreclosure crisis in our judicial workload forecasts and certification requests, which currently suggest that this crisis will taper off with possible pre-recessionary filing normalization occurring in the summer of 2015, barring any unforeseen circumstances.

Notwithstanding decreased filings in some filing categories, our three-year average net need analysis continues to indicate that additional judgeships are necessary in the First (one judge) and Fifth (two judges) judicial circuits. This three-year average net need reflects sustained workload over a multi-year period.

The First Judicial Circuit continues to experience a heavy criminal workload as well as a steady number of tobacco cases, which frequently go to trial and thus require significant judicial labor. The Fifth Judicial Circuit continues to be one of the fastest growing areas of the state with a corresponding workload increase. Within the Fifth Judicial Circuit, Sumter and Lake counties are experiencing significant increases in Hispanic and Asian demographics. These demographics, in turn, have created a surge in court interpreting events which results in additional judicial workload. The circuit is also geographically large requiring circuit judges to spend time traveling between counties, which impacts their availability.

Several chief judges reference high jury trial rates, increases in motions and hearings, and the emergence of more complex civil cases as factors that continue to increase trial court workload. In addition, several chief judges throughout the state continue to advise the Court that statutory requirements for additional hearings for certain case types contribute to case complexity and judicial workload. Two recent examples of requirements that add to case complexity are the Timely Justice Act of 2013, Ch. 2013-216, Laws of Florida, and changes to Jimmy Ryce Act proceedings, Ch. 2014-2 and 2014-3, Laws of Florida. The Timely Justice Act legislation requires additional judicial resources to timely handle post-conviction proceedings for persons sentenced to death. Often, post-conviction motions are complex, involving multiple issues and requiring lengthy evidentiary hearings.

The 2014 changes to the Jimmy Ryce Act created a number of procedures, referral processes, and notice requirements that may result in more people being evaluated for commitment and more petitions being filed.

Many of our chief judges express concern about delay associated with obtaining hearing times. In some circuits, dockets are so full that it takes several weeks to schedule a hearing. Similarly, lengthy hearings and jury trials must be scheduled months in advance. Judges continue to report to their chief judges that they are increasingly challenged to devote adequate time to hearings due to increased volume. Case complexity, more and lengthier hearings, and crowded dockets all contribute to court delay.

Our judges also continue to absorb the work previously performed by case managers, law clerks, magistrates, and other supplemental support staff lost in the budget reductions of recent years.[3] Most of these positions provided direct case management, legal research, and adjudicatory support to our judges. The consensus among chief judges is that loss of support staff translates into slower case processing times, congested dockets, and long waits to access judicial calendars.

---

3. When the case weights were originally developed in 1999 and updated in 2007, they incorporated the availability of supplemental resources to assist judges with case processing matters. It is reasonable to conclude that the loss of these supplemental positions (i.e., case managers, law clerks, and magistrates) may increase the case weights if not restored prior to the next case-weight update.

Despite these identified workload challenges, our trial courts continue to make significant headway towards reducing the overall backlog of foreclosure cases associated with the mortgage foreclosure crisis. For example, from Fiscal Year 2012/2013 to Fiscal Year 2013/2014, the foreclosure backlog was reduced by over fifty percent. In recognition of this protracted crisis the Legislature, using monies from the national mortgage foreclosure settlement,[4] provided dedicated funding for Fiscal Year 2013/2014 and Fiscal Year 2014/2015 that has enabled the court system to secure the services of additional senior judges, magistrates, and case managers. This Court is grateful for that funding. The case managers, magistrates, and senior judges made available through this appropriation are making a difference in reducing the foreclosure backlog throughout the state. We continue to monitor the progress of this backlog for each circuit and regularly communicate with the chief judges to identify issues that might be increasing disposition times.

As with circuit court work, county court workload remains high with unmet judicial need holding steady. In some counties, chief judges report that misdemeanor, domestic, and stalking violence cases are increasing county court workload. Additionally, the passage of new laws each year contributes to the increased workload. For example, in October 2013, the texting while driving law

4. This program is commonly known as the Foreclosure Backlog Reduction Initiative.

went into effect. This law creates a new infraction that, although a secondary offense, is nonetheless likely to increase judicial caseloads. The loss of civil traffic infraction hearing officers in county court, coupled with added workload associated with new legislation, continues to increase county judge workload. These factors, among others, contribute to such a high county court judicial need.

Additionally, self-represented litigants who are frequently unprepared for the rigors of presenting evidence, following rules of procedure, and generally representing themselves in court also create additional work for trial judges. Increased judicial involvement in these cases where one or more parties represent themselves, entails lengthier hearings, rescheduled hearings, and court delay. The impact of self-represented litigants occurs in both circuit and county courts.

## JUDICIAL WORKLOAD STUDY

We are now seven years removed from updating the case weights used by this Court to evaluate judicial workload in the trial courts.[5] Consistent with the original recommendations of the 1999 Workload Study, judicial case weights should ideally be updated every five years. Accordingly, the Office of the State Courts Administrator will be updating all of the trial court case weights beginning in early 2015.

---

5. See Judicial Resource Study conducted in Fiscal Year 2006/2007, available at http://www.flcourts.org/core/fileparse.php/260/urlt/JRSReport_final. pdf.

As with previous studies, the assessment of workload will be comprehensive and carefully validated and we will keep the Legislature fully apprised through its Office of Program Policy and Government Accountability. Oversight of this initiative will be conducted by the Court Statistics and Workload Committee of the Commission on Trial Court Performance and Accountability. The entire multi-phase study will take approximately sixteen months, with completion expected in the summer of 2016.

## DISTRICT COURTS OF APPEAL

We are not certifying a need for district court judges during this certification cycle. As part of our five-year review cycle for the district courts, all district court judges are providing direct feedback on the relative case weights used by this Court to evaluate district court judicial need. Once approved, we anticipate using the revised weights during next year's judicial certification process. The Court thanks the Legislature for funding the three district court judges certified in last year's opinion and for its continued support to upgrade district court facilities across the state.

## CONCLUSION

We have conducted both a quantitative and qualitative assessment of judicial workload. Using the case-weighted methodology and the application of other factors identified in Florida Rule of Judicial Administration 2.240, we certify the

need for thirty-five additional trial court judgeships in Florida, consisting of three circuit court judgeships and thirty-two county court judgeships, as set forth in the appendix to this opinion. This certification request is conservative in that we are requesting the minimum number of trial judges necessary to address sustained documented workload.

We continue to closely monitor the downward filing trends for multiple trial court divisions. These factors and others will be carefully documented in the upcoming Judicial Workload Study. We appreciate the legislative appropriation to address the backlog of foreclosure cases throughout the state. The monies provided for senior judges, magistrates, case management, and technology have made a tremendous difference in the court system's ability to reduce the overall backlog of pending foreclosure cases.

Although constitutionally required to certify judicial need, we are mindful of competing funding needs both elsewhere in state government and within the judicial branch. On balance, we have determined that highest priority should go to those critical issues included in the Judicial Branch's Fiscal Year 2015/2016 Legislative Budget Request.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

Original Proceeding – Certification of Need for Additional Judges

# APPENDIX
## Trial Court Need

| Circuit | Circuit Court Certified Judges | County | County Court Certified Judges |
|---|---|---|---|
| 1 | 1 | N/A | 0 |
| 2 | 0 | N/A | 0 |
| 3 | 0 | N/A | 0 |
| 4 | 0 | Duval | 3 |
| 5 | 2 | Citrus | 1 |
| | | Lake | 1 |
| 6 | 0 | N/A | 0 |
| 7 | 0 | N/A | 0 |
| 8 | 0 | N/A | 0 |
| 9 | 0 | Orange | 1 |
| | | Osceola | 1 |
| 10 | 0 | N/A | 0 |
| 11 | 0 | Miami-Dade | 8 |
| 12 | 0 | N/A | 0 |
| 13 | 0 | Hillsborough | 8 |
| 14 | 0 | N/A | 0 |
| 15 | 0 | Palm Beach | 5 |
| 16 | 0 | N/A | 0 |
| 17 | 0 | Broward | 1 |
| 18 | 0 | Seminole | 1 |
| 19 | 0 | N/A | 0 |
| 20 | 0 | Lee | 2 |
| **Total** | 3 | **Total** | 32 |